Bryan Hurlbutt (ISB # 8501)
Laurence ("Laird") J. Lucas (ISB # 4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

Roger Flynn (*pro hac vice pending*) (Colo. Bar # 21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, CO 80540
(303) 823-5738
(303) 823-5732 (fax)
wmap@igc.org

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| IDAHO CONSERVATION LEAGUE, and GREATER YELLOWSTONE COALITION, | ) ) ) | No. 1:18-cv-504 |
| *Plaintiffs*, | ) ) | **COMPLAINT** |
| v. | ) ) ) | |
| U.S. FOREST SERVICE, | ) ) | |
| *Defendant*. | ) ) | |

## NATURE OF THE ACTION

1.       This action challenges the U.S. Forest Service's approval of the Kilgore

Exploration Project, a 5-year mining exploration project in the Caribou-Targhee National Forest,

for violations of the National Environmental Policy Act (NEPA), the National Forest

Management Act (NFMA), and the Forest Service Organic Act.  Over Plaintiffs' administrative objections, the Forest Service approved the Project through a Decision Notice and Finding of No Significant Impact issued on August 20, 2018 (DN/FONSI), based on an Environmental Assessment (EA) issued in May 2018.

2.      The Project site is on public lands in the Centennial Mountains in Clark County, Idaho, near the Idaho-Montana border.  The Project is part of the Greater Yellowstone Ecosystem and lies within an important wildlife corridor, linking grizzly bears and other wildlife in Yellowstone to other parts of the Northern Rockies.  Streams dissecting the Project site are tributaries to Corral and West Camas Creeks, which support Yellowstone cutthroat trout.  West Camas Creek flows through the downstream Camas National Wildlife Refuge and to Mud Lake.

3.      The purpose of the Project is to gather mineral information at the site, where Otis Gold Corporation ("Otis Gold") has stated it intends to build an open-pit, cyanide heap leach mine, should exploration yield sufficient gold deposits.  Otis Gold has already engaged in exploration over the last few years and now seeks to significantly expand the scale of exploration and earth disturbing activities.  As approved by the Forest Service in the EA and DN/FONSI, Otis Gold would strip vegetation to build an extensive network of 10 miles of new roads and 140 drill stations at the forested, mountainous Project site.  Each year, Otis Gold would be authorized to operate three motorized drill rigs 24 hours a day, seven days a week, from July 16 through November to drill up to 420 exploratory holes by Project completion.  On average, drill holes would extend 1,300 feet underground.

4.      The Kilgore Exploration Project will have potentially significant impacts on Forest Service designated "sensitive species" including grizzly bear, whitebark pine, Columbia spotted frog, and Yellowstone cutthroat trout.  The extensive network of Project roads will

decrease the amount of secure habitat for grizzly bears—which were recently relisted as "threatened" under the Endangered Species Act (ESA)—and requires cutting down whitebark pine trees—a "candidate species" for ESA listing whose seeds are an important grizzly food source. Any grizzly bears in the area will be disturbed by the noise and activity associated with Otis Gold's 24-7 drilling, road and drill pad construction, and steady vehicle traffic to shuttle workers, fuel, and other supplies to and from drill pads. Furthermore, increased site development and human presence and activity in grizzly bear habitat is a significant factor increasing the risk of grizzly bear mortality.

5.     Additionally, by constructing, maintaining, and using the extensive network of new and existing roads and drill stations, Otis Gold will harm Yellowstone cutthroat trout and Columbia spotted frog that inhabit streams and wetlands at the Project site by causing sediment pollution, impeding spotted frog migration, and creating the risk of fuel spills and contamination from drilling, among other adverse impacts of the Project.

6.     Despite the large scale of the Kilgore Project and its potentially significant impacts, the Forest Service approved the Project through the EA and DN/FONSI without thoroughly analyzing the likely adverse impacts through a full Environmental Impact Statement (EIS), in violation of NEPA. In the EA and DN/FONSI, the Forest Service improperly downplayed and ignored the Project's adverse impacts to sensitive species and their habitat, failed to consider any action alternatives to Otis Gold's full proposal, failed to follow standards and guidelines in the Targhee Forest Plan, and failed to minimize and mitigate adverse impacts, in violation of NEPA, NFMA, and the Organic Act.

7.     Based on these and other violations of law, Plaintiffs request that the Court set aside and vacate the EA and DN/FONSI, and enter other relief as prayed for below.

## JURISDICTION AND VENUE

8.      Jurisdiction is proper in this Court under 18 U.S.C. § 1331 because this action arises under the laws of the United States, including NEPA, 42 U.S.C. §§ 4321 *et seq.*; NFMA, 16 U.S.C. §§ 1600 *et seq.*; the Forest Service Organic Act, 16 U.S.C. §§ 473 *et seq.*; the Administrative Procedure Act, 5 U.S.C. §§ 701 *et seq.* (APA); the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*; and the Equal Access to Justice Act, 28 U.S.C. §§ 2212, 2214.

9.      An actual, justiciable controversy exists between Plaintiffs and Defendants.  The requested relief is therefore proper under 5 U.S.C. §§ 701–706 and 28 U.S.C. §§ 2201–2202.

10.     Venue is properly vested in this Court pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred within this judicial district, Plaintiffs and the Defendant are located in this district, and the public lands and resources in question are in this district.

11.     The federal government has waived sovereign immunity in this action pursuant to 5 U.S.C. § 702.

## PARTIES

12.     Plaintiff IDAHO CONSERVATION LEAGUE (ICL) is an Idaho non-profit conservation organization founded in 1973.  ICL is headquartered in Boise and also has offices and staff in Ketchum and Sandpoint, Idaho.  ICL is dedicated to protecting Idaho's wild lands, clean water and air, healthy families, and quality way of life.  Central to ICL's mission is protecting public lands and the fish and wildlife they sustain from improper mining and mine exploration.  ICL has more than 30,000 supporters located across Idaho and the nation.  Many ICL board members, staff, and supporters regularly use and enjoy, and have a deep personal interest in, the Caribou-Targhee National Forest, the Centennial Mountains, and the Camas

National Wildlife Refuge, and in protecting and conserving their rich natural resources and fish and wildlife, including grizzly bear and other species threatened by the Kilgore Project.

13.     Plaintiff GREATER YELLOWSTONE COALTION (GYC) is a regional non-profit conservation organization dedicated to protecting and restoring the lands, waters, and wildlife of the Greater Yellowstone Ecosystem and the unique quality of life it sustains.  GYC is headquartered in Bozeman, Montana, and has long maintained an office and staff in eastern Idaho.  Central to GYC's mission is maintaining the integrity of national forests and wildlife corridors that are important to the Greater Yellowstone Ecosystem.  Formed in 1983, GYC has approximately 90,000 members, including many in Idaho.  Many GYC board members, staff, and supporters regularly use and enjoy, and have a deep personal interest in, the Caribou-Targhee National Forest, the Centennial Mountains, and the Camas National Wildlife Refuge, and in protecting and conserving their rich natural resources and fish and wildlife, including grizzly bears and other species threatened by the Kilgore Project.

14.     Plaintiffs' staff, members, and supporters regularly use and enjoy the public lands and waters at and around the Project site for recreation, conservation, scientific, aesthetic, and other uses, and Plaintiffs will continue to do so in the future.  Plaintiffs' staff, members, and supporters also use and enjoy fish and wildlife that live in and depend on the Project site and nearby areas for their survival.  These uses will be harmed or even eliminated by the Kilgore Project.

15.     Moreover, the Forest Service's violations of NEPA injure Plaintiffs and their staff, members, and supporters by denying them the ability to adequately participate in the public review process and by denying them information concerning potential environmental impacts and other issues that NEPA requires agencies to disclose, analyze, and seek public review of

prior to authorizing the Project.

16.     Plaintiffs also suffer injury-in-fact because they have devoted time, energy, and money to protecting wildlife, water quality, and fisheries and advocating for responsible mining in the Project area.  Plaintiffs have diverted resources from other efforts to pursue their missions and have instead used those resources to submit public comment to the Forest Service, file administrative objections, and engage with local, state, and federal officials about their concerns with the Kilgore Project.

17.     Defendant U.S. FOREST SERVICE is an agency or instrumentality of the United States within the U.S. Department of Agriculture.  The Forest Service is vested with the authority and duty to manage and protect the public lands and resources of the Caribou-Targhee National Forest.

18.     Defendant's violations of law, as alleged herein, injure the aesthetic, commercial, conservation, scientific, recreational, educational, wildlife preservation, and/or other interests of Plaintiffs and their staff, supporters, and members.  These are actual, concrete injuries caused by Defendant's violations of law, and the judicial relief sought would remedy, in whole or in part, Plaintiffs' injuries.

19.     Plaintiffs' interests have been, are being, and will continue to be irreparably injured and harmed by Defendant's actions as challenged herein.  Unless the relief prayed for herein is granted, Plaintiffs and the public will suffer irreparable harm and injury to their legally protected interests.

## LEGAL BACKGROUND

**A.     The National Environmental Policy Act**

20.     The National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370(h),

requires federal agencies to take a "hard look" at the environmental consequences of their proposed actions. *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Blue Mountain Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998). To take this "hard look," federal agencies must prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

21.     An agency may avoid an EIS only if it finds, after preparing an EA, that the action will have "no significant impact," in which case the agency may issue a finding of no significant impact (FONSI). 40 C.F.R. §§ 1501.4(b), 1508.9 & 1508.913. The standard for when an agency must prepare an EIS is a "low standard." *Klamath Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

22.     NEPA's purpose is "to foster excellent action," and the "NEPA process is intended to help public officials make decisions that are based on an understanding of environmental consequences, and take actions that protect, restore, and enhance the environment." *Id.* at 1500.1(c). The NEPA process requires that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id.* at 1500.1(b). The information agencies are required to gather and disclose during the NEPA process "must be of high quality." *Id.* "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id.*

23.     The scope of NEPA review is quite broad. A federal agency must consider alternatives to the proposed action and evaluate and disclose environmental impacts. 40 C.F.R. 1508.9. Impacts include direct, indirect, and cumulative effects of the proposed action and its alternatives on ecological, aesthetic, historic, cultural, economic, social, and health interests. 40 C.F.R. §§ 1508.7 & 1508.8. Cumulative effects are the impacts on the environment that result

from incremental impacts of the action when added to all other past, present, and reasonably-foreseeable future actions regardless of what agency or person undertakes such other actions. *Id.* § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions." *Id.*

**B.     The Forest Service Organic Act of 1897**

24.     The Organic Act requires the Forest Service "to regulate [the] occupancy and use [of national forests] and to preserve the forests thereon from destruction." 16 U.S.C. § 551. The Organic Act also requires that those persons "prospecting, locating, and developing the mineral resources [on a national forest] . . . must comply with the rules and regulations covering such national forests." 16 U.S.C. § 478.

25.     The U.S. Forest Service's mining regulations require that "all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest resources." 36 C.F.R. 228.4(c)(3). The regulations also require the Forest Service "to maintain and protect fisheries and wildlife which may be affected by the operations." 36 C.F.R. 228.8(e). The Forest Service can and must reject an unreasonable mine plan and prohibit mining activity until appropriate evaluation of the plan is completed and reasonable mitigation measures are in place to protect public resources.

**C.     The National Forest Management Act & The Caribou-Targhee Forest Plan**

26.     NFMA requires the Forest Service to prepare a land and resource management plan (commonly called a "forest plan") for each national forest including standards and guidelines for how the forest shall be managed. 16 U.S.C. §§ 1604(a), (e) & (g)(3)(B).

27.     Under NFMA and its implementing regulations, the Forest Service has a duty to "provide for diversity of plant and animal communities" in its forest plans. 16 U.S.C. §

1604(g)(3)(B); 36 C.F.R. § 219.9.  To accomplish this, the forest plan "must include plan components to maintain or restore" rare plant communities and "maintain a viable population of each species of conservation concern within the plan area," among other requirements.  36 C.F.R. §§ 219.9(a)(2) & (b)(1).

28.     Department of Agriculture Regulation 9500-4 directs the Forest Service to manage "habitats for all existing native and nonnative plants, fish, and wildlife species in order to maintain at least viable populations of such species" and to avoid actions "which may cause a species to become threatened or endangered."  Under this directive, the Forest Service has adopted a sensitive species policy, instructing the agency to:

1. Assist states in achieving their goals for conservation of endemic species.

2.  Review programs and activities as part of the [NEPA] process through a biological evaluation, to determine their potential effect on sensitive species.

3.  Avoid or minimize impacts to species whose viability has been identified as a concern.

4.  Analyze, if impacts cannot be avoided, the significance of potential adverse effects on the population or its habitat within the area of concern and on the species as a whole.  (The line officer, with project approval authority, makes the decision to allow or disallow impact, but the decision must not result in loss of species viability or create significant trends toward federal listing.)

5.  Establish management objectives in cooperation with the states when projects on National Forest System lands may have a significant effect on sensitive species population numbers or distributions. . . .

Forest Service Manual, 2670.32.

29.     At the time the Forest Service approved the Kilgore Project, grizzly bear, whitebark pine, Yellowstone cutthroat trout, and Columbia spotted frog were each designated as "sensitive species" in the Caribou-Targhee National Forest.

30.     NFMA and its implementing regulations also require that all management actions approved by the Forest Service must be consistent with the governing forest plan.  16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

31.     The Forest Service adopted forest plans for the Caribou and Targhee National Forests, which contain goals, objectives, guidelines, and standards for managing mineral resources and protecting the environment.  A forest plan "standard" places binding limitations on the Forest Service's management actions, requiring a forest plan amendment to deviate from the standard.  *See Targhee Forest Plan* at III-2.  A forest plan "guideline" represents a "preferred or advisable course of action", and the "rationale for [] a deviation [from a guideline] shall be documented in the project decision document."  *Id.*

32.     The applicable forest plan for the Kilgore Project is the *Revised Forest Plan For The Targhee National Forest* (Apr. 1997) (hereafter "Targhee Forest Plan" or "Forest Plan"). The Targhee Forest Plan includes numerous goals, objectives, guidelines, and standards to protect grizzly bear, whitebark pine, Yellowstone cutthroat trout, and Columbia spotted frog, and their habitats.

### STATEMENT OF FACTS

**A.      The Kilgore Project**

33.     The Kilgore Project is a five-year program proposed by mining company Otis Gold Corporation to explore for minerals on federal public lands.  As approved by the Forest Service, Otis Gold would build roads and drill pads in the Dubois Ranger District of the Caribou-

Targhee National Forest to drill exploration holes in four target areas (Mine Ridge, Gold Ridge, Prospect Ridge, and Dog Bone) to assess the grade, tonnage, and extent of minerals underlying the Project site.  Otis Gold has stated it hopes to eventually build an open-pit, cyanide heap-leach gold mine at the site should it discover sufficient ore deposits.

34.    The Project site is located in the Centennial Mountains, five miles northwest of Kilgore, Idaho, in Clark County.  The mountainous Project site is dissected by numerous headwater streams, which all flow into West Camas Creek or Beaver Creek, which in turn both flow south to irrigated agriculture lands through the Camas National Wildlife Refuge and to Mud Lake on the Snake River Plain south of Dubois, Idaho.

35.    The Project site is located in the High Divide, which is an area along the Idaho-Montana border that is recognized for its critical wildlife habitat and its role as an east-west path for expanding and migrating wildlife in and out of Yellowstone National Park.  The High Divide connects three large ecosystems of the Northern Rockies: the Greater Yellowstone; the Crown of the Continent in Montana and Idaho; and the wild lands of central Idaho.  Of 40 National Forest ranger districts throughout the High Divide in Idaho and Montana, the Dubois Ranger District has been identified in one study as the most important ranger district for ecological connectivity.

36.    Otis Gold would directly disturb approximately 23 acres at the Project site to construct over ten miles of new roads and 140 drill stations.  Additionally, Otis Gold would use and maintain—instead of decommissioning and reclaiming—about 3 miles of roads authorized for use as part of Otis Gold's previous exploration activities at the site.  Otis Gold would also use existing Forest Service roads and trails and would widen those when needed to construct its drill stations.

37.     Project activities would commence annually on July 15 and last into November. During operations, Otis Gold could drill up to 24 hours per day, seven days per week, with three drill rigs operating at a time.  Otis Gold would construct up to 140 drill stations, with up to three drill holes drilled at each station.  Each drill hole would average 1,300 feet deep.  Drill pads would be 50 feet long and generally as wide as the road.  Sumps to hold drilling fluids would be excavated to 15 feet by 6 feet by 8 feet deep at each drill station.

38.     To obtain drill water, and other water needed for the Project, Otis Gold is authorized to pump water from an existing on-site well and to pump water directly from two creeks: West Camas Creek and Corral Creek.

39.     The Project is much larger than other exploration activities previously proposed by Otis Gold and approved by the Forest Service.  In 2014, the Forest Service approved (also through an EA and a DN/FONSI), Otis Gold's plan to construct less than a mile (3,919 feet) of temporary roads to access 16 drill sites in the Mine Ridge target area, disturbing 7.1 total acres at the Project site.  And in 2017, the Forest Service approved through a NEPA "categorical exclusion" Otis Gold's proposal for 0.5 acres of surface disturbance to construct timber platforms and use helicopters to drill at seven drill stations in the Gold Ridge target area and 27 stations in the Mine Ridge target area without any new road construction or tree cutting.

**B.      Forest Service Approval of the Kilgore Project**

40.     Otis Gold submitted a Plan of Operations to the Forest Service in September 2017 seeking approval of the Kilgore Exploration Project.  The Forest Service listed the Project in its Schedule of Proposed Actions in January 2018 and took public comment during a 30-day scoping period.  *Id.*

41.    Plaintiffs submitted scoping comments by letter dated February 9, 2018, raising concerns that Otis Gold's extensive road and drill pad construction and drilling would disturb wildlife and degrade their habitat, degrade water quality, and adversely impact the ecologically-important Centennial Mountains and High Divide, among other concerns.  Plaintiffs also identified action alternatives for the Forest Service to consider that would allow Otis Gold to explore, but with less impacts.  Plaintiffs also urged the Forest Service to prepare an EIS based on the large scale of the Project and based on other factors.

42.    Despite the serious concerns raised during the comment period, the Forest Service decided to move forward quickly to prepare a shorter EA instead of an EIS.

43.    On May 17, 2018, the Forest Service released the final EA without ever releasing a draft of the EA for public comment.  In the EA, the Forest Service considered only two alternatives: the "Action Alternative" (Otis Gold's proposal) and the "No Action Alternative." According to the Forest Service, the No Action Alternative could not be selected and was considered only as a basis for comparing impacts to the Action Alternative.  The Forest Service was unwilling to consider any other action alternatives in the EA that would allow Otis Gold to conduct exploration while reducing environmental impacts.

44.    On May 17, 2018, the Forest Service also released the draft DN/FONSI, initiating a 45-day administrative objection period.  The draft DN/FONSI proposed approving Otis Gold's proposal based on the EA.

45.    Plaintiffs filed objections on July 2, 2018, again raising concerns that the Forest Service failed in the EA and draft DN/FONSI to disclose, evaluate, and mitigate against adverse impacts of Otis Gold's activities; failed to consider action alternatives that would avoid, minimize, or mitigate impacts; and should prepare an EIS, among other concerns.

46.     The Forest Service denied Plaintiffs' objections by letter dated August 9, 2018. In denying Plaintiffs' objection, the Regional Office of the Forest Service asked the district ranger to add a few documents to the Project record and proceed with approving the Project.

47.     The Forest Service issued the final DN/FONSI on August 20, 2018, approving the Project as proposed in the EA and draft DN/FONSI.

## C.     Adverse Project Impacts to Grizzly Bear

48.     Prior to European settlement, an estimated 50,000 grizzlies roamed the lower 48 states. 82 Fed. Reg. 30,502, 30,508 (Jun. 30, 2017). By the 1930s, just 125 years after European settlers moved into grizzly country, grizzly bears were found in only two percent of their former range. *Id.* By 1975, only six grizzly populations remained in the lower 48. The Greater Yellowstone Ecosystem, covering portions of Wyoming, Montana, and Idaho was home to one of the largest of those populations, estimated in 1975 at 136 to 312 bears. *Id.*

49.     The grizzly bear was listed in the lower 48 states as a threatened species in 1975 under the ESA. 40 Fed. Reg. 31,734 (Jul. 28, 1975). Since 1982, the U.S. Fish and Wildlife Service (FWS) has focused on fostering recovery in six ecosystems within the lower 48 states, including: the Greater Yellowstone Ecosystem; the Northern Continental Divide Ecosystem of north-central Montana; (3) the Cabinet-Yaak area extending from northwest Montana to northern Idaho; (4) the Selkirk Mountains in northern Idaho, northeast Washington, and southeast British Columbia; (5) north-central Washington's North Cascades area; and (6) the Bitterroot Mountains of western Montana and central Idaho. 82 Fed. Reg. at 30,508–09. A substantial population of grizzly bears is found in only two of the six ecosystems: the Greater Yellowstone region with an estimated 700-plus bears and the Northern Continental Divide region with an estimated 900-plus bears. *Id.* There are no known grizzly bears occupying the 6 million acres of viable habitat in

the Selway-Bitterroot Recovery Area on the Idaho-Montana border.

50.     In 2007, FWS designated the Greater Yellowstone Ecosystem grizzly (GYE grizzly) as a distinct population segment and delisted it under the ESA.  72 Fed. Reg. 14,866 (Mar. 29, 2007).  FWS's delisting rule was vacated by *GYC v. Servheen*, 672 F. Supp. 2d 1105 (D. Mont. 2009) because (1) inadequate regulatory mechanisms existed to ensure a healthy and adequate grizzly population and (2) FWS failed to consider the threat posed to GYE grizzly by declining whitebark pine seed, which is a substantial grizzly food source.  The Ninth Circuit reversed as to the first reason but affirmed as to the second, upholding the vacatur of the delisting rule.  After remand, on June 30, 2017, FWS again delisted the GYE population of grizzly. 82 Fed. Reg. 30,502 (Jun. 30, 2017).

51.     When the Kilgore Exploration Project was proposed in September 2017 through its approval in August 2018, the GYE grizzly bear was not an ESA-listed species.[1]  However, the GYE grizzly bear was a Forest Service designated "sensitive species."

52.     The Project site is located within the present range of GYE grizzly.  The site is in the Centennial Mountains within a critical wildlife corridor linking GYE grizzly bear to areas of unoccupied habitat and to other grizzly populations in the Northern Rockies.  As already mentioned, the Dubois Ranger District has been identified as the most important of 40 Ranger Districts in the High Divide for species connectivity, including for grizzly.  Protecting the quality and security of the habitat in the remaining corridors between core recovery areas is critical to restoring the metapopulation structure of grizzly bears in the lower 48 and ensuring genetic viability of distinct grizzly bear populations into the future.

---

[1]     Shortly after the Project was approved, the GYE grizzly bear's status as a "threatened" species under the ESA was reinstated by the decision in *Crow Indian Tribe, et al.*, v. *U.S.*, CV 17-89-M-DLC (D. Mont. Sep. 24, 2018).

53.    In the EA, the Forest Service admitted Otis Gold's motorized activities will disturb bears and that its road construction will decrease secure habitat for bears.  But the Forest Service claimed these adverse Project impacts to bears are "unlikely" based on a number of inaccurate assumptions and misleading claims.

54.    While the Forest Service admitted the Project site is grizzly bear habitat, it claimed it is not "important" grizzly habitat despite substantial information to the contrary. During scoping, many commenters pointed out the importance of the area to grizzly.  Plaintiffs presented studies and modeling showing that the Centennial Mountains and the site of the Kilgore Mine proposal lie within the region's top priority areas for ecological and grizzly bear habitat connectivity.  In response to these comments, the Forest Service repeatedly—and incorrectly—asserted that the Project is not located in the Centennial Mountains.

55.    The Forest Service also downplayed the Project's impacts by focusing on bear radio locations to claim grizzlies do not use the area much, and therefore, are unlikely to be impacted.  The Forest Service failed to disclose, however, that only a small percentage of grizzly bears have radio collars.  Typically, only around five to ten percent of GYE grizzly have telemetry or GPS collars at any given time.

56.    Additionally, the Forest Service ignored other information on bear presence such as bear sightings in the area in recent years.  For example, during the objection period and before the Project was approved, a grizzly was reported in the West Camas Creek drainage in the McGarry Canyon area near the Project site on June 29, 2018, and a large male grizzly was trapped by Idaho Fish and Game in the Dry Creek drainage near Kilgore on July 25, 2018.  But the Forest Service never considered these sightings, other recent sightings, or other information on bear presence near the Project area.

57.     The Forest Service also failed to account for the fact that as the GYE grizzly bear population increases, bears may need to move into the Project area.  In the Wildlife Specialist Report, the Forest Service acknowledged that GYE grizzly has expanded its range, distribution, and numbers and that the GYE population is approaching carrying capacity in its current distribution.  As the GYE population approaches carrying capacity, more space as well as connectivity to other habitats is critical for grizzly bear recovery.  Yet in the EA, Forest Service ignored this and claimed the Project area and its surroundings are unimportant and unlikely to be used by grizzly bears.

58.     In the EA, the Forest Service admitted that the "amount of secure habitat within a grizzly bear's home range is likely the most important determinant of grizzly bear survival." Forest roads decrease secure bear habitat and increase the likelihood of human conflicts with bears.  But the Forest Service underestimated the acreage of roads attributable to the Project.  If the Forest Service denied the Project, Otis Gold would be required to reclaim 6.9 acres (or about three miles) of previously authorized exploration roads, thereby reducing the amount of roads at the Project site under the No Action Alternative.  Whereas by approving the Project, these three miles of roads would not be reclaimed now and would remain open and used by Otis Gold for this Project and possibly for future activities.  But the Forest Service failed to recognize this and, thus, undercounted the extent of open roads attributable to the Project by three miles in the EA.

59.     The Forest Service also underestimated the total site disturbance, and resulting loss in secure bear habitat, by failing to account for the fact that Otis Gold would widen roads and trails to accommodate drill stations.  While the Forest Service stated that drill stations will be located within new and existing roads, and calculates total acres of disturbance based on this, the Forest Service admitted elsewhere in the EA that roads would need to be widened and areas

adjacent to them may need to be cleared of vegetation.  For example, some drill pads would be located on "FS Trail 5," which the Forest Service admitted will have to be widened to accommodate drill pads and equipment.  But the Forest Service never included this additional site disturbance in any of its analyses.

60.     The Forest Service also failed to account for the cumulative impacts of Otis Gold's past exploration activities and other past activities at the Project site.  When considering the direct impacts of the Project itself, the Forest Service uses these past activities at the Project site to its advantage, asserting that adverse Project impacts to bears are "unlikely" because the frequency of impacts that have already occurred from past exploration activities and because the related high road density in the Project area make it unattractive and inhospitable to bears.  Yet elsewhere in its approval of the Project, the Forest Service ignored these very same impacts.

61.     For example, in its cumulative effects analysis in the EA, the Forest Service made the contradictory and demonstrably false claim that the Project will have essentially no cumulative impacts to grizzly bear: "Cumulative effects would not contribute to project effects in a way which is detrimental to grizzly bears."  In this instance, the Forest Service ignored the significant and lasting adverse impacts to grizzly bears caused by Otis Gold's recent exploration and road building and by other similar past activities at the Project site.

62.     The cumulative impacts analysis also failed to provide any quantified or detailed information on other past, present, and reasonably foreseeable impacts to grizzly.  In the EA, the Forest Service admitted grizzly conflicts occur from livestock grazing, vegetation management can disturb and decrease grizzly habitat, and illegal OHV routes can decrease secure habitat, but the Forest Service simply assumed these impacts would be small without fully disclosing the extent of these activities or providing any meaningful evaluation of their potential impact.

63.     Noticeably absent from the EA and DN/FONSI are any specific measures to avoid, minimize, mitigate, or monitor impacts to grizzly.  The Targhee Forest Plan includes many goals, objectives, guidelines, and standards to protect and monitor grizzly bear and bear habitat in the Project area, but the Forest Service ignored these Forest Plan provisions.

64.     For example, the Targhee Forest Plan, at III-148, includes a binding standard for minerals projects requiring that "[a]ll operating plans . . . specify measures to meet grizzly bear management goals and objectives for grizzly bear habitat."  These grizzly management goals and objectives include: increasing secure grizzly habitat; prioritizing grizzly and grizzly habitat needs over conflicting forest uses; and allowing for unhindered bear movement and continuity of suitable habitat.  However, in the DN/FONSI and EA, the Forest Service failed to even mention this Forest Plan standard, failed to mention the Forest Plan goals and objectives to which it refers, and failed to specify measures Otis Gold must include in its operating plan to meet those goals and objectives.

65.     Additional Forest Plan standards at III-148 require (among other things) temporary cessation or modification of mineral activities to resolve grizzly conflicts and reporting observations of grizzly or their signs.  But the Forest Service failed to consider these Forest Plan standards or impose their requirements on Otis Gold in the EA and DN/FONSI.

66.     The Forest Service also failed to consider any action alternatives that could reduce impacts to grizzly bear.  During the scoping and objection processes, Plaintiffs recommended a reduced road alternative, a helicopter drilling alternative, and a concentrated drilling with concurrent reclamation alternative to minimize and avoid impacts to grizzly and grizzly habitat. But the Forest Service never considered these and instead considered only Otis Gold's proposal and the No Action Alternative.

67.     Despite all of this, the Forest Service concluded in the DN/FONSI that the Project will have no significant impacts.  Notably, however, the FONSI fails to even mention grizzly bear.

**D.     Adverse Project Impacts to Whitebark Pine**

68.     Whitebark pine is a conifer found at alpine tree line and upper subalpine elevations throughout the western United States and Canada.  Most stands of whitebark pine in the United States are on public land managed by the Forest Service or the National Park Service. Whitebark pine influences ecosystem processes at multiple scales and serves as both a keystone and foundation species throughout its range.  Whitebark pine seeds are an important food source for grizzly bear.

69.     Whitebark pine is a slow-growing, long-lived tree with a life span of up to 500 years and sometimes more than 1,000 years.  Whitebark pine trees are capable of producing seed cones at 20 to 30 years of age.  Large cones are not produced until 60 to 80 years.  Whitebark pine seed caching by Clark's nutcracker is key to the tree's seed dispersal and subsequent seedling establishment.

70.     Whitebark pine is a candidate species for ESA-listing and is a sensitive species in the Caribou-Targhee National Forest.  In the GYE, whitebark pine management is coordinated by the Whitebark Pine Subcommittee of the Greater Yellowstone Coordinating Committee.

71.     In 2017, field personnel surveyed the Project site for whitebark pine within 100-foot buffers on each side of Otis Gold's proposed roads.  The Forest Service admitted that a "relatively large number of whitebark pine" were found within the road buffers and that removing whitebark pine trees is likely unavoidable within Otis Gold's area of surface disturbance.  But the Forest Service dismissed these impacts as insignificant, because it

estimated that roughly only 0.5 percent of individual whitebark pine in the Project area would be

lost, and because Otis Gold will try to avoid existing healthy mature whitebark pine "to the

extent possible."  However, the Forest Service never estimated the impacts to healthy mature

whitebark pines capable of seed production.

     72.    The Forest Service also admitted that Otis Gold's surface disturbance may create

the opportunity for noxious weeds to become established and spread, which would have a

negative impact on whitebark pine throughout the Project area.  But the Forest Service dismissed

these threats, simply claiming Project Best Management Practices (BMPs) "reduce this risk."

     73.    The Forest Plan includes a guideline which provides: "Maintain, and where

possible, increase unique or difficult-to-replace[ ]elements or habitats such as whitebark pine,

and areas of high species diversity, such as aspen, riparian zones, etc." *Targhee Forest Plan* at

III-13.  But instead of maintaining or increasing whitebark pine habitat, the Project will decrease

whitebark pine habitat and delay the maturation of seed-producing trees.  The Forest Service,

however, never explained why it was deviating from this Forest Plan guideline, and the Forest

Service never considered alternatives, like helicopter access to all, or even some, of the drill

sites, which could have allowed Otis Gold to conduct exploration while avoiding or reducing

damage to whitebark pine.

     74.    A Forest Plan plant species diversity goal is to: "Provide necessary protection and

management to conserve listed, threatened, endangered and sensitive plant species." *Targhee*

*Forest Plan* at III-14.  A related Forest Plan standard provides: "Information on the presence of

listed threatened, endangered or sensitive plant species will be included in all assessments for

vegetation and/or ground disturbing management activities. . . . Appropriate protection and

mitigation measures will be applied to the management activities." *Id.* at III-14.  Yet, the Forest

Service did not provide information on the estimated impacts to healthy, mature white bark pine or develop appropriate whitebark pine measures to avoid, minimize, or mitigate Project impacts.

75.     The Forest Service also admitted that whitebark pine is at high risk throughout its range from nonnative white pine blister rust and native mountain pine beetle and that climate change is increasing these risks.  Additionally, the Forest Service admitted historic and modern fire suppression harm whitebark pine in multiple ways.  Nevertheless, the Forest Service asserted, without providing any quantified or detailed information about these cumulative effects, that the Project and these threats "will not have a measurable cumulative effect."

76.     Also, the Forest Service never considered how direct, indirect, and cumulative adverse effects to whitebark pine may adversely affect GYE grizzly bears.

**E.    Adverse Project Impacts to Streams and Riparian Areas**

77.     In the EA, the Forest Service estimated that Otis Gold's road and drill station construction will disturb nearly 23 acres of the Project site in the Camas Creek and Beaver Creek watersheds, including 1.5 acres of disturbance within protected Aquatic Influence Zones (AIZs). The Camas Creek and Beaver Creek watersheds support Yellowstone cutthroat trout and Columbia spotted frog, among other aquatic species.  These creeks eventually combine with others and flow into the Camas National Wildlife Refuge.  Water is also diverted for agricultural purposes and to recharge the Snake River aquifer.

78.     The Camas National Wildlife Refuge was established in 1937 with the intent to provide habitat for nesting waterfowl and resting and feeding habitat for spring and fall migrating ducks, geese, and other waterfowl.  Camas Creek flows for eight miles through the refuge and provides water to the many lakes and ponds located within the refuge boundaries. About half of the Refuge's 10,578 acres are lakes, ponds, and marshlands; the remainder consists

of lush grass, sagebrush uplands, and meadows.  Water management is critical to the Refuge's operations.  An extensive system of canals, dikes, wells, ponds, and water-control structures is used to manipulate water to benefit wildlife.  During dry summer months, several wells sustain the lakes and ponds to provide wildlife habitat.

79.    The Idaho Department of Environmental Quality classifies West Camas Creek and some of its tributaries in the Project area as "impaired" because these streams fail to meet State of Idaho water quality standards designed to protect cold water aquatic life.  These creeks and streams are impaired due to excessive sediment and temperature pollution and due to poor habitat conditions.  Yellowstone cutthroat trout are very susceptible to sediment and temperature pollution.  Their stream-bottom nests require clean, cold water to deliver oxygen and remove waste, and emerging and young fish need clean, cold water to thrive.

80.    The Targhee Forest Plan includes numerous goals, objectives, guidelines, and standards to protect water quality, streams, riparian areas, and species that depend on those areas.  Among other stream and riparian goals, Forest Plan goals include: "[m]aintain or improve water quality to meet water quality standards of the State[] of Idaho"; "[m]aintain or restore stream channel integrity, channel processes, and the sediment regime (including the elements of timing, volume, and character of sediment input and transport) under which the riparian and aquatic ecosystems naturally developed"; and "[m]aintain or restore aquatic habitats necessary to support overall biodiversity, including unique genetic stocks such as native cutthroat trout that evolved within the specific geo-climatic regions," among other goals.  *Targhee Forest Plan* at III-9.

81.    To protect streams and riparian areas, the Forest Plan creates AIZs to "serve as important reservoirs of biodiversity, critical linkages for the interchange of plant and animal genetic material, specialized areas of nutrient cycling and freshwater filtration, storage, and

transport, and are important to water quality." *Id.* at III-106. "These aquatic influence zones provide a high level of aquatic protection and maintain ecological functions (eg, sediment transport, microclimate control, nutrient regulation, and connectivity within the watershed) and processes (eg, stream channel formation, plant community development, recruitment of organic material including large wood, and hydrologic cycles) necessary for the restoration and maintenance of habitat for aquatic and riparian dependent organisms." *Id.*

82.     For fish-bearing stream reaches, AIZs include the stream and a 150 to 300-foot buffer on each side. *Id.* at III-108. For perennial non-fish bearing stream reaches, AIZs include the stream and a 75 to 150-foot buffer on each side. *Id.* For intermittent streams and wetlands less than one acre, AIZs include the stream or wetland and a 75 to 100-foot buffer on either side. *Id.*

83.     Otis Gold's proposal includes five stream crossings and would cause at least 1.5 acres of combined disturbance within AIZs at the Project site. In the EA, the Forest Service admitted Otis Gold's road construction, drilling, water drafting, and road use will cause sediment loading, hydrological runoff shift, water drafting contamination, increased temperature, and sediment suspension in these watersheds. But the Forest Service dismissed these impacts, asserting that "[a]ll these potential impacts are mitigated" by the Project's BMPs and design features and will be negligible.

84.     With respect to sediment loading, Otis Gold's plan to construct, maintain, reclaim, and drive on forest roads will contribute sediment to nearby streams. The Forest Service admitted Otis Gold's new access roads within the Project site are the Project's "largest disturbance" and are "the most likely source of chronic sediment increases to streams." Roads ND14, ND4D, ND4A, ND21, ND30, ND11A, 556A, and road segments 3 and 12 are within AIZ

boundaries and, thus, near streams.  But the Forest Service never evaluated these and other sediment sources that could impair water quality and degrade habitat for Yellowstone cutthroat trout and Columbia spotted frogs.

85.     Typically, for other surface-disturbing projects in national forests, the Forest Service evaluates increased sediment caused by the project.  For similar and recent mine exploration projects in Idaho, like the CuMo Exploration Project in the Boise National Forest and the Golden Meadows Project in the Payette National Forest, the Forest Service modeled sediment delivery and calculated the increase in sediment each project would cause to different streams in and near the project sites.  But here, the Forest Service did not do any sediment modeling and simply claimed "[i]mpacts to sediment/siltation 303(d) listed streams would be negligible."

86.     This is particularly troubling because the Soils Specialist Report found that Otis Gold's road development would occur in areas of "less stable landforms."  "Most of the road development would occur across soils within steep areas, some of which have characteristic [sic] of potential instability requiring proper design considerations," which can cause "increased risk of erosion and sedimentation to streams in areas where the roads are in close proximity to streams."  Yet, the EA and DN/FONSI omitted this information.

87.     To protect against the risks of steep slopes and unstable soils, the Forest Plan includes the following standard: "In areas of high mass instability, that have been ground verified, occupancy shall not be allowed."  *Targhee Forest Plan* at III-7.  It also includes the following guideline: "In areas identified as having moderate instability, and that are ground verified, occupancy may be allowed provided it can be shown the project design can prevent unacceptable resource damage."  *Id.*  In the 2014 EA for a previous Otis Gold exploration, the

soils section included a map identifying unstable landforms; based on that map, it appears that many of Otis Gold's new road segments and drill pads would be located in areas identified as "unstable soils." But no similar map is included for the Project, and neither the EA, DN/FONSI, nor the Soils Specialist Report show that the Forest Service ever considered these Forest Plan provisions.

88.     With respect to water temperature increases, the Forest Service admitted that Otis Gold's surface disturbing activities, including clearing 1.5 acres of land within AIZs, will remove vegetation and reduce stream shading, which increases water temperatures. But instead of evaluating these temperature increases, the Forest Service just assumed they will be negligible, even though some streams in and downstream of the Project area currently fail to meet Idaho's temperature standards.

89.     For both sediment and temperature pollution, existing roads in the Project area contribute to the Project's effects, but existing roads were never considered as cumulative effects to water quality. And, as with impacts to grizzly, the Forest Service improperly assumed that all existing roads would remain in place under the No Action Alternative, when in fact Otis Gold would be required to decommission and reclaim about three miles of roads it used during prior exploration, which would in turn reduce sediment delivery and increase shading vegetation compared to Otis Gold's proposal. But the Forest Service failed to consider this and simply claimed that impaired streams would remain impaired and that the situation would not improve under the No Action Alternative.

90.     In addition to sediment and temperature pollution, the Forest Service admitted there is a potential for chemicals, petroleum products, or other hazardous materials used by Otis Gold to degrade water quality. But the Forest Service downplayed these impacts by emphasizing

that no hazardous materials would be stored within AIZs.  However, the Forest Service failed to consider that fuel and lubricants will be hauled by trucks along and through AIZs, creating the risk of a spill and contamination.  Otis Gold will frequently deliver fuel for drill rigs and other equipment to the Project site using pickup trucks each mounted with 100-gallon capacity slip tanks.  Yet the EA failed to evaluate the risk of fuel spills from these frequent fuel transport to and around the Project site.

91.     There is no documentation of how many fuel deliveries will occur each day, in what quantity, and along what route(s).  This is the type of information the Forest Service used to evaluate the risk of a fuel spill for other similar mine exploration projects in Idaho, like the CuMo and Golden Meadows projects.  Not only did the Forest Service fail to consider this information and fail to evaluate the likelihood of a fuel spill, but it also failed to adequately consider and disclose the harm that could result in the event of such a spill, which could harm water quality, Yellowstone cutthroat trout, Columbia spotted frog, and the Camas National Wildlife Refuge.  Again, the Forest Service simply assumed, without evaluating their effectiveness, that Project BMPs and design features render such impacts inconsequential.

92.     The Forest Service also failed to disclose and consider which access routes Otis Gold will use to get to the Project site.  Fuel trucks and other Project vehicles driving to and from the Project site can cause sediment delivery and create the risk of fuel spills to nearby streams on the way to the site.  A map included in the Forest Service approval of Otis Gold's 2014 exploration plans shows an access route from the Kilgore Store.  This route includes crossing and traveling near multiple streams, including West Camas Creek, Crab Creek, McGary Canyon Creek, and others on the way to the Project site.  But the Forest Service never considered or mitigated for these impacts.

93.     The Forest Service also admitted that Otis Gold's extensive drilling can impact groundwater hydrology, which can cause water contamination.  According to the Forest Service, drilling could encounter groundwater and drilling fluids and drill water could be discharged to subsurface zones.  In 1994, Echo Bay Exploration Inc. reported "extensive groundwater encountered in nearly all drilling" in the Project area, and Otis Gold has continued to regularly encounter groundwater during drilling.  But in the EA and Hydrogeology Specialist Report, the Forest Service misleadingly understates: "Exploration drilling activities in the past encountered groundwater with *some* of the exploration drill holes" (emphasis added).

94.     This is particularly concerning because water quality sampling in the area has identified elevated levels of arsenic, mercury, and other harmful contaminants in surface and groundwater at different locations at the Project site.  For example, in 2013, the arsenic concentration in the groundwater well Otis Gold uses for drilling water as 13.0 ug/L of arsenic, which exceeds Idaho's 10 ug/L surface water quality standard for arsenic.  Also in 2013, mercury concentrations in McGarry Creek were 0.069 and 0.037 ug/L, both of which exceed Idaho's 0.012 ug/L standard.  But the Forest Service did not disclose this particular information in the EA or the DN/FONSI.

95.     The Forest Service did admit that no monitoring has ever occurred for groundwater encountered by an exploration drill hole and that other monitoring demonstrates arsenic, iron, nickel, selenium, and zinc are present in water at the Project site.  But then the Forest Service misleadingly downplayed these issues by vaguely stating in the EA: "Groundwater parameters collected over the years from the well show expected values typical for groundwater found in epithermal mineralization areas," without stating what those values were or disclosing that some values exceeded Idaho water quality standards.

96.     While Otis Gold plans to use a closed-loop drilling system to contain drilling fluids and groundwater, there can still be situations when drilling fluids and groundwater travel through fractures and leak out on hillsides or in springs and seeps.  Pressurized drilling can temporarily increase groundwater flows and with it, flows of hazardous materials, which can reach surface water.  The Forest Service admitted that Otis Gold's drilling poses these risks to water quality, but the agency relied on past and ongoing water quality monitoring to claim contamination is unlikely.  The Forest Service explained that "any significant changes to field parameters, water quality constituents, or spring discharge would be reported to FS personnel" and appropriate steps would then be taken to address the problem.

97.      But the Forest Service failed to recognize that Otis Gold's past and future water quality monitoring is located in only three of its four drilling areas.  Otis Gold initiated stream flow and water quality monitoring in 2013 on Crab, McGarry, and West Camas Creeks, and expanded to Prospect, Rex, Rey, and Allan Creeks in 2017.  These monitoring sites are all located in or near and downstream of the Gold Ridge, Mine Ridge, and Prospect Ridge target areas.

98.     None of the past and ongoing monitoring locations are in or downstream of the Dog Bone Ridge target area.  Accordingly, there is no baseline water quality information for Dog Bone Ridge, and any change in flows or water quality that might occur during Otis Gold's drilling at Dog Bone Ridge would go unnoticed and unmitigated.  Nevertheless, the Forest Service dismissed these impacts as insignificant.

99.     Despite these unexamined and potentially significant impacts to water quality and riparian areas, the Forest Service determined all impacts were insignificant.

**F.      Adverse Impacts to Yellowstone Cutthroat Trout**

100.     Yellowstone cutthroat trout are a sensitive species native to the Project area and surrounding watersheds.  Surveys in 2018 and 2008 found Yellowstone cutthroat trout in Corral Creek (on the West side of the Project area) and West Camas Creek (on the East side of the Project area).  Allan, McGarry, and East Fork of Rattlesnake Creek are also fish-bearing streams at the Project site which could support Yellowstone cutthroat trout, though they have not been found there in recent surveys.

101.     Despite the presence of Yellowstone cutthroat and streams that could support them both in and downstream of the Project site, the Forest Service chose to exclude Yellowstone cutthroat trout in the EA and DN/FONSI.  A Biological Evaluation (BE) in the Project Record does, however, consider impacts to Yellowstone cutthroat trout.

102.     In the BE, the Forest Service admitted Otis Gold's water drafting, spills, sediment delivery, and the spread of aquatic invasive species could adversely impact Yellowstone cutthroat trout.  The Forest Service also acknowledged that all fish-bearing streams and fish habitat in the Project area are listed as impaired by the Idaho Department of Environmental Quality because they fail to support cold water aquatic life and salmonids spawning water quality criteria "due to sediment/siltation, combined biota/habitat bioassessments, and temperature impairment issues."  And the Forest Service recognized that these habitat and water impairments contribute to Yellowstone cutthroat trout barely hanging on in the West Camas Creek watershed. Yet despite all of this, the Forest Service simply claimed in the BE that "the Project's activities will have NO IMPACT on the [Yellowstone cutthroat trout] and its' habitat."

103.     The Forest Service failed to gather and consider basic information that could support this conclusion.  The Forest Service never modeled sediment or temperature pollution

and never conducted a fuel spill risk analysis for fish-bearing streams, including those known to support Yellowstone cutthroat trout.

104.    The Forest Plan includes numerous goals, objectives, and guidelines to protect Yellowstone cutthroat trout.  It includes a table of expected values for healthy native fish habitat conditions at the watershed scale, including values for the following habitat features: pool frequency, water temperature, large woody debris, bank stability, lower bank angle, and width/depth ratio.  *Targhee Forest Plan* at III-11.  A guideline provides: "Within subwatersheds occupied by native cutthroat trout or designated as vital to meeting recovery goals, avoid management activities that are found, through interdisciplinary site-specific analysis, to either reduce habitat features below the expected values described [in the table] above or retard the rate of recovery of degraded habitat features."  *Id.* at III-11.

105.    But the Forest Service did not follow this guideline and never explained why. Neither the DN/FONSI, EA, nor BE mention these habitat features, their expected values to support fish, or their values in the fish bearing streams at the Project site.  And based on the fact that these streams are all impaired, it would seem that they are in need of recovery; yet, the Forest Service is allowing Otis Gold to disturb 1.5 acres within AIZs, withdraw water, and take other actions which will further reduce habitat features and retard rates of recovery.

106.    This lack of analysis of Yellowstone cutthroat trout habitat features runs afoul of another Forest Plan guideline: "Emphasize watershed analysis or site-specific analysis to more accurately define fisheries habitat features when planning or conducting management activities within Native Trout Watersheds."  *Id.* at III-11.  But again, the Forest Service failed to even consider, let alone comply with, this guideline.

G.        **Adverse Impacts to Columbia Spotted Frog**

107.    Columbia spotted frog is a sensitive species in the Caribou-Targhee National Forest and inhabits streams, wetlands, and riparian areas at the Project site.  To protect Columbia spotted frog, the Forest Plan includes a spotted frog habitat goal: "Maintain riparian vegetation in desired vegetation condition."  *Targhee Forest Plan* at III-22.  However, the Forest Service excluded Columbia spotted frog from consideration in the EA and DN/FONSI.

108.    A Wildlife Specialist Report in the Project record does consider impacts to Columbia spotted frog.  In the Report, the Forest Service admitted Otis Gold's water withdrawals could lower water levels in Columbia spotted frog breeding or summering habitat, and that project activities including road construction and road use could cause direct mortality to frogs.  But without even considering basic information necessary to understand these adverse impacts, the Forest Service dismissed them as insignificant.

109.    In the Report, the Forest Service admitted spotted frog may be present in all suitable habitat at the Project site.  It is known that spotted frogs breed in Camas Creek beaver ponds near Otis Gold's water withdrawal site.  They also have bred in a small seep created by previous mining activity on the claim.  But the Report does not even disclose the location of the small seep, and there is no indication as to what type and how much activity Otis Gold may perform near the seep breeding site.  And the Forest Service failed to identify other locations where frogs breed at the Project site.  Instead of surveying for and protecting frog breeding sites before approving the Project, the Forest Service decided to survey suitable wetlands in the Project area later, once the Project is underway.

110.    The Forest Service also failed to survey or otherwise identify where frogs travel throughout the Project site.  This is particularly concerning because Otis Gold's season of

activity overlaps with the time frogs are expected to move throughout the Project site, making them susceptible to direct mortality from Otis Gold's road and drill pad construction and frequent vehicle travel.

111.   In the Wildlife Specialist Report, the Forest Service acknowledged that spotted frogs "may be present in any riparian zone, especially during the summer," and that while frogs are mostly confined to aquatic areas, Columbia spotted frogs do travel overland.  According to the Report, frog movements occur in July, when spotted frogs may move to summer habitats, and from August to October, when spotted frogs move from summer foraging areas to over-winter sites.

112.   The Forest Service admitted in the Report that frogs are "very susceptible to road mortality because they are a slow-moving species."  The Forest Service estimated that Otis Gold will use 21.5 miles of roads, using two to six pick ups per day and a water truck as necessary.  But the Forest Service failed to identify how many vehicle trips or miles of travel each truck will make each day and failed to estimate of the degree to which frogs may be impacted.

113.   With respect to water withdrawals, the Wildlife Specialist Report says there are four water sources: Otis Gold's existing well, West Camas Creek at the road crossing, Corral Creek, and an un-named tributary near FR 566.  The Forest Service admitted Otis Gold's operating season from mid July to November corresponds with "low flow periods,"  which generally occur in August and September.  Then the Forest Service asserted that "it is not possible to know the average flow of the tributaries during July 15 to early November and determine the maximum percentage of withdrawal from each creek."  This is wrong.  In fact, the Forest Service is requiring monitoring at the Corral Creek water drafting location later, once the Project is underway, to determine base flows and variability.  The Forest Service could have

gathered, but chose not to gather, this baseline information at all of the water drafting sites prior to approving the Project.

114.    In the Wildlife Specialist Report, the Forest Service also identified cumulative effects that harm frogs but concluded "cumulative effects do not contribute to direct and indirect effects in a manner which is detrimental to the Columbia spotted frog."  The Forest Service reached this conclusion without surveying frog breeding sites and migration routes and without any quantified or detailed information about the degree of impact from the Project and other cumulative effects.

### FIRST CLAIM FOR RELIEF:
### NEPA & APA Violations for Inadequate EA/FONSI

115.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

116.    This first claim challenges the Forest Service's violations of NEPA, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, by authorizing the Kilgore Exploration Project based on the defective EA and DN/FONSI without taking a "hard look" at potential impacts as required by NEPA.  Plaintiffs bring this claim pursuant to the judicial review provisions of the Administrative Procedure Act (APA), 5 U.S.C. § 706.

117.    As alleged hereinabove, and as will be presented in further briefing before the Court, the EA and DN/FONSI are based upon unsupported assumptions, errors, and omissions which render them grossly deficient under NEPA, including but not limited to the following:

>   (a) Failing to use available baseline information on grizzly bear presence in and near the Project area, and failing to disclose the limits of the radiolocation data the agency used to consider bear presence;

>   (b) Erroneously determining the Project is not located in the Centennial Mountains, and failing to disclose and evaluate impacts to this important grizzly bear corridor

and area of grizzly bear expansion;

(c) Failing to evaluate impacts to mature, seed-bearing whitebark pine that could be cleared by road and drill station construction;

(d) Failing to consider how adverse impacts to whitebark pine at the Project site impact grizzly bear;

(e) Failing to disclose basic information about Otis Gold's road and drill pad construction, maintenance, and use (such as vehicle travel frequency, fuel haul routes, road construction and maintenance practices, and stream crossing methods and frequency) necessary to evaluate potential impacts to wildlife, water quality, fisheries, and frogs from noise disturbance, habitat loss, and direct mortality, and other adverse impacts;

(f) Failing to adequately assess sediment delivery and temperature increases to streams in the Project area caused by road and drill pad construction, maintenance, and use, and failing to consider the impacts to water quality and fisheries;

(g) Failing to disclose and consider Otis Gold's fuel haul routes outside and inside the Project area, the proximity of haul routes to streams, and the frequency of fuel haul delivery, and failing to assess the risk of a fuel spill and the potential impacts to water quality and aquatic species at the Project site and downstream;

(h) Failing to gather and disclose complete and up-to-date baseline information on Yellowstone cutthroat trout populations and habitat characteristics in streams impacted by the Project, and failing to adequately consider direct, indirect, and cumulative effects of the Project to Yellowstone cutthroat trout;

(i)   Failing to gather up-to-date and complete breeding site and water quantity information necessary to evaluate the adverse impacts to Columbia spotted frogs from Otis Gold's water withdrawals from frog-inhabited streams and wetlands at the Project site;

(j)   Failing to consider Columbia spotted frog dispersal paths and direct mortality from Otis Gold's construction activities and use of vehicles and other equipment;

(k)   Failing to recognize recent exploration roads would be decommissioned and reclaimed under the No Action Alternative, which would improve habitat conditions and water quality at the Project site;

(l)   Failing to adequately consider the cumulative impacts to sensitive species and their habitat from prior activities at the Project site, including Otis Gold's exploration activities since 2008, and from other past, present, and reasonably foreseeable future actions when added to the impacts of Otis Gold's extensive new Project;

(m)  Failing to disclose and address Forest Plan goals, objectives, guidelines, and standards relevant to assessing impacts to grizzly bear, whitebark pine, Yellowstone cutthroat trout, Columbia spotted frog, and their habitat;

(n)   Improperly relying on post-approval monitoring and mitigation as a substitute for gathering baseline information and evaluating potential impacts in the EA and DN/FONSI regarding sensitive species, their habitat, and water quality;

(o)   Failing to consider a reasonable range of alternatives by considering only Otis Gold's proposal and a No Action Alternative without reasonably deciding not to consider other alternatives proposed by Plaintiffs;

(p) Failing to obtain adequate baseline data and analyze impacts from encountering

water during drilling, and disposal of water and other drilling fluids or solids

throughout the site;

(q) Failing to collect baseline water quality and hydrogeology data related to the Dog

Bone Ridge drilling area, and relying on monitoring and mitigation to protect

water quality when no monitoring would occur at Dog Bone Ridge; and

(r) Failing to provide sufficient mitigation analysis, including an analysis of the

effectiveness of the purported mitigation, but relying on mitigation to downplay

impacts to grizzly bear, whitebark pine, Yellowstone cutthroat trout, Columbia

spotted frog, and water quality.

118.    Because the Forest Service violated NEPA's requirements in relying on the

defective EA and DN/FONSI, its action approving the Kilgore Exploration Project is arbitrary,

capricious, an abuse of discretion, not in accordance with law, without observance of procedure

required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the

meaning of the judicial review provisions of the APA; and must be held unlawful and set aside

under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

**SECOND CLAIM FOR RELIEF:**
**NEPA & APA Violations for Failure to Prepare an EIS**

119.    Plaintiffs reallege and incorporate by reference the preceding paragraphs.

120.    This second claim challenges the Forest Service's violations of the National

Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq.*, and NEPA's implementing regulations, by

authorizing the Kilgore Exploration Project without preparing a full Environmental Impact

Statement.  Plaintiffs bring this claim pursuant to the judicial review provisions of the APA, 5

U.S.C. § 706.

121.     NEPA requires federal agencies to prepare a full EIS for "major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).

122.     Under NEPA's implementing regulations, "significance" requires an evaluation of both the "context" of the action and its "intensity."  "Context" means that "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality."  40 C.F.R. §1508.27(a)–(b).  "Intensity" refers to the "severity of impact."  *Id.*, § 1508.27(b).  Factors relevant to this determination include impacts that may be both beneficial and adverse; the degree of impact on public safety; unique characteristics of the geographic area; whether the proposed action is highly controversial; whether the proposed action involves highly uncertain or unknown risks; whether the action will set a precedent for future actions; whether there will be cumulatively significant impacts; and whether the action threatens a violation of other federal or state laws, policies, or requirements.  *Id.*

123.     As alleged hereinabove, and as will be presented in detail in further briefing before the Court, the Forest Service's approval of the Kilgore Exploration Project is a major federal action significantly affecting the quality of the human environment and requires preparation of a full EIS under NEPA for many reasons, including but not limited to:

> (a) The direct, indirect, and cumulative impacts to sensitive species, including grizzly bear, whitebark pine, Yellowstone cutthroat trout, and Columbia spotted frog and their habitat, are highly controversial, unknown, and/or uncertain and may significantly impact these species in and around the Project area;
>
> (b) The direct, indirect, and cumulative impacts to water quality are highly

controversial, unknown, and/or uncertain and may significantly impact the Camas and Beaver Creek watersheds and the many tributaries that dissect the Project site;

(c) The Project will impact unique characteristics including the Centennial Mountains and High Divide wildlife corridor where the Project is located and the Camas National Wildlife Refuge downstream of the Project;

(d) The Project threatens a violation of law by allowing exploration to proceed that does not comply with binding Forest Plan standards and other requirements; and

(e) Reliance on a legally-inadequate EA also renders the DN/FONSI legally inadequate.

124.     Because the Forest Service violated NEPA's requirements by approving the Kilgore Exploration Project through an inadequate EA and DN/FONSI and failing to prepare an EIS, its action is arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### THIRD CLAIM FOR RELIEF:
#### NFMA & APA Violations

125.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

126.     This third claim challenges the Forest Service's violations of the National Forest Management Act, 16 U.S.C. §§ 1601 *et seq.*, and NFMA's implementing regulations, by failing to comply with NFMA regulations and the Targhee Forest Plan.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

127.     NFMA and its implementing regulations require that all management actions

approved by the Forest Service must be consistent with the governing forest plan.  16 U.S.C. §

1604(i); 36 C.F.R. § 219.10(e).  The Targhee Forest Plan guidelines (which are to be followed

unless a rationale is provided in the decision document) and binding standards to protect grizzly

bear, whitebark pine, Yellowstone cutthroat trout, and Columbia spotted frog, and these species'

habitat.

128.    As alleged hereinabove, and as will be presented in detail in further briefing

before the Court, the Forest Service's approval of the Kilgore Exploration Project is inconsistent

with the Forest Plan by, among other issues noted herein:

> (a) Failing to comply with Forest Plan minerals standards at page III-148 that require
> operating plans to specify measures to meet grizzly bear management goals and
> habitat objectives, and require temporary cessation or modification of activities to
> resolve grizzly conflicts and reporting observations of grizzly or their signs;

> (b) Failing to follow, or explain in the decision document why it is not following, the
> Forest Plan guideline at page III-13 requiring maintaining or increasing where
> possible whitebark pine habitat, and failing to comply with the Forest Plan
> standard at page III-14 requiring appropriate protection and mitigation measures
> for whitebark pine;

> (c) Failing to comply with the Forest Plan standard at page III-7 prohibiting
> occupancy in areas of high mass instability and/or failing to follow or explain in
> the decision document why it is not following the Forest Plan guideline at page
> III-7 that in areas of moderate instability, occupancy may be allowed only if it can
> be shown that the project design can prevent unacceptable resource damage; and

(d) Failing to follow or explain in the decision document why it is not following the Forest Plan guideline at page III-11 to avoid activities that reduce Yellowstone cutthroat trout habitat features below expected values or retard the rate of recovery of degraded features;

129.     Additionally, the Forest Service failed to comply with the Forest Service's own sensitive species policy (Forest Service Manual, 2670.32) and Department of Agriculture Regulation 9500-4 by failing to maintain viable populations of grizzly bear, whitebark pine, Yellowstone cutthroat trout, and Columbia spotted frog; failing to avoid actions which may cause these species to become threatened or endangered; and failing to establish management objectives for a Project which may have a significant effect on population numbers or distributions of these sensitive species.

130.     The Forest Service's approval of the Kilgore Exploration Project is thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

### FOURTH CLAIM FOR RELIEF:
### Organic Act & APA Violations for Failure to Minimize Impacts

131.     Plaintiffs reallege and incorporate by reference the preceding paragraphs.

132.     This fourth claim challenges the Forest Service's violations of the Organic Act, 16 U.S.C. §§ 473 *et seq.*, and its implementing regulations, by approving the Kilgore Exploration Project without minimizing impacts to, and without adequately protecting, forest resources.  This claim is brought pursuant to the judicial review provisions of the APA, 5 U.S.C. § 706.

133.    The Organic Act requires the Forest Service "to regulate [the] occupancy and use [of national forests] and to preserve the forests thereon from destruction."  16 U.S.C. § 551.  The U.S. Forest Service's mining regulations require that "all [mining] operations shall be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest resources." 36 C.F.R. 228.4(c)(3).  These regulations also require the Forest Service "to maintain and protect fisheries and wildlife which may be affected by the operations."  36 C.F.R. 228.8(e).

134.    As alleged hereinabove, and as will be presented in detail in further briefing before the Court, the Forest Service's approval of the Kilgore Exploration Project fails to minimize adverse environmental impacts of the Project and fails to protect fish and wildlife for many reasons, including but not limited to:

(a) Failing to take reasonable measures to avoid, mitigate, and/or minimize adverse impacts to grizzly bear from surface disturbing activities by failing to reduce new road construction, which decreases secure bear habitat and removes whitebark pine food sources;

(b) Failing to take reasonable measures to avoid and/or mitigate adverse impacts to water quality and aquatic species from road construction and maintenance, fuel haul, and other vehicle traffic by failing to minimize the amount of these activities in and near streams, riparian areas, unstable slopes, and frog habitat and migration corridors, and failing to impose reasonable measures to avoid and mitigate impacts where these activities are allowed; and

(c) Failing to take reasonable measures to avoid and/or mitigate impacts to groundwater and water quality from drilling by failing to require monitoring and mitigation on streams in and/or downstream of the Dog Bone Ridge target area;

135.     The Forest Service's approval of the Kilgore Exploration Project is thus arbitrary, capricious, an abuse of discretion, not in accordance with the law, without observance of procedure required by law, and/or in excess of statutory jurisdiction, authority, or limitations within the meaning of the judicial review provisions of the APA; and must be held unlawful and set aside under 5 U.S.C. 706(2).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

A.     Order, declare, and adjudge that the Forest Service's EA and DN/FONSI approving the Kilgore Exploration Project are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law under NEPA, NFMA, the Organic Act, and their implementing regulations, policies, and requirements, and/or the APA;

B.     Vacate, set aside, reverse, and remand the EA and DN/FONSI;

C.     Order the Forest Service to prepare an EIS;

D.     Enter such temporary, preliminary, or permanent injunctive relief as Plaintiffs may hereafter seek;

E.     Award Plaintiffs their reasonable costs, litigation expenses, and attorney's fees associated with this litigation pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412 *et seq.*, and all other applicable authorities; and

F.     Grant such further and additional relief as the Court deems just and proper in order to remedy Defendant's violations of law and protect the plaintiffs and the public interest.

Dated this 13th day of November, 2018.

Respectfully submitted,

*/s/ Bryan Hurlbutt*
Bryan Hurlbutt (ISB # 8501)
Laurence ("Laird") J. Lucas (ISB #4733)
ADVOCATES FOR THE WEST
P.O. Box 1612
Boise, ID 83701
(208) 342-7024
(208) 342-8286 (fax)
bhurlbutt@advocateswest.org
llucas@advocateswest.org

Roger Flynn (*pro hac vice pending*) (Colo. Bar #
21078)
WESTERN MINING ACTION PROJECT
P.O. Box 349
Lyons, CO 80540
(303) 823-5738
(303) 823-5732 (fax)
wmap@igc.org

*Attorneys for Plaintiffs*